IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:20CV445-GCM

| | | |
|---|---|---|
| RICKY D. JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| FIRST-CITIZENS BANK & TRUST | ) | |
| COMPANY and CENTRAL LOAN | ) | |
| ADMINISTRATION & REPORTING | ) | |
| a/k/a CENLAR FSB, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the Court upon Defendant Cenlar's Motion for Summary Judgment. The motion has been fully briefed and oral argument was held on April 4, 2022.

## I.      FACTUAL BACKGROUND

On August 12, 2020, Plaintiff Ricky D. Jones ("Jones") filed the instant action against Defendants First Citizens Bank & Trust Company ("First Citizens") and Central Loan Administration and Reporting, also known as Cenlar FSB ("Cenlar"), alleging claims of (1) negligent servicing, (2) negligent misrepresentation, (3) violation of the Real Estate Settlement Procedures Act ("RESPA"), and (4) violation of the North Carolina Debt Collection Act ("NCDCA").  (DE 1).  The basis for the claims is that Cenlar (the servicer of Jones' home loan) and First Citizens (the originator of the loan) foreclosed on his home without proper notices after receipt of a complete loss mitigation application. Plaintiff has now dismissed his claims against First Citizens, leaving Cenlar as the sole remaining Defendant. Cenlar seeks summary judgment on all claims as well as for emotional distress and punitive damages.

1

## A.    Foreclosure Process

In March 2008, First Citizens originated a home loan to Jones for $127,200.00.  (DE 38-3 at 6).  First Citizens then transferred its right to service the loan to Cenlar pursuant to a general Subservicing Agreement. (DE 29 at 2; DE 44).

Pursuant to the Subservicing Agreement, Cenlar was the servicer of Jones' loan at all relevant times and solicited and collected all payments before default.  In August 2018, after Jones failed to make loan payments, Cenlar recommended to First Citizens that it begin foreclosure proceedings.

On September 10, 2018, Cenlar received an application from Jones seeking loss mitigation assistance as an alternative to foreclosure.  (DE 38-3).  Because Cenlar told First Citizens about Jones' loss mitigation application, First Citizens sent required pre-foreclosure letters to Jones in September and November 2018, which stated the balance of the loan.  (DE 29 at 15–16).

In response to Jones' mitigation application, Cenlar sent a letter to Jones on September 13, 2018, informing Jones that his application was "incomplete" and that additional documents were needed by October 28, 2018.  (DE 38-3).  The letter warned that "failure to submit all the required documentation or information may result in your ineligibility for a loan modification or foreclosure alternative and any foreclosure proceedings will continue."  The letter also stated that depending on when documents are received "there is no guarantee of an evaluation for a workout option and suspension of foreclosure proceedings."  The letter also stated in bold font that "this letter is an attempt to collect a debt."  (DE 38-3 at 32–34).

On October 29, 2018, Cenlar sent Jones another letter that said his application was still "incomplete" but extended the deadline for submitting the additional documents to November 13, 2018.  The letter contained all the same warnings and language as the September 13 letter.  (DE

2

38-3 at 36–38).  On November 13, 2018, Jones' application was still missing documents and was incomplete.  (DE 38-3 at 3).

On November 15, 2018, First Citizens, via a trustee, commenced a foreclosure special proceeding by filing a notice of hearing on foreclosure of deed of trust in the Mecklenburg County Superior Court.  The notice of hearing said that First Citizens was foreclosing for Jones' failure to make payments and advised Jones that he had the right to appear at the foreclosure hearing and contest the evidence or otherwise advocate on his behalf.  The foreclosure hearing was scheduled for December 10, 2018 and Jones was properly served with notice of the hearing.  (DE 38-4).

On November 16, 2018, Cenlar sent a letter to Jones informing him that the deadline to provide the requested documents as listed in the two subsequent letters had passed and "we will not be able to give further consideration to your request and will discontinue processing your incomplete application."  The letter also stated in bold font that "this letter is an attempt to collect a debt."  (DE 38-3 at 41).

Thereafter, Jones submitted additional documents in support of his loss mitigation application with Cenlar.  In response, on December 27, 2018, Cenlar sent a letter to Jones confirming receipt and stated that "upon initial review, the application appears complete and no further information is needed at this time."  The letter further provided that:

> You are entitled to certain foreclosure protections as we have received your completed application.  You may also be eligible for additional protections under State or Federal law.  Your application will be reviewed . . . within 30 days of 12/26/2018.  Should we require further information within the designated timeframe to complete review of your Loss Mitigation Application, you will receive a letter indicating what documentation is still needed and will be allowed 30 days to submit the requested documentation.  If this occurs, the evaluation process may take longer than expected and the foreclosure protections could expire if we do not receive the requested information in a timely manner.  Once a thorough underwriting evaluation of your application has been completed, we will contact you with our decision.

3

The letter also stated in all caps that "this communication is from a debt collector.  This is an attempt to collect a debt."  (DE 38-3 at 44–45).

On January 14, 2019, Cenlar sent a letter to Jones requesting additional information.  The letter stated that "we will allow 30 days from the date of this letter for you to provide the requested information and if it is not received by 02/13/2019, your request for a foreclosure alternative may be denied."  The letter also warned that failure to provide the requested information by the deadline "may result in your ineligibility for a loan modification or foreclosure alternative and any foreclosure proceedings will continue."  The letter also included the same debt collector note in all caps as the December 17 letter.  (DE 38-3 at 47–49).  Cenlar alleges that Jones did not submit all required documents by the February 13, 2019 deadline.  (DE 38-1 at 6).  Cenlar admits that Jones submitted all requested additional documents (updated bank statements and a letter explaining certain income) before the February 13 deadline except for a signed First Citizens financial form. (DE 38-3 at 17–18).

After Jones received the January 14 letter, and before the February 13 deadline, he called Cenlar to ask about the First Citizens financial form.  In a recorded call that Cenlar produced, Jones stated:

> I'm calling about this ridiculously stupid letter that I'm getting.  And mind you, this convoluted nonsense has been going on since September, thinking I had submitted a complete package to you guys early in January . . . where in the crap do I get a First Citizens financial form from?

(DE 47-8 at 6-8).  A representative of Cenlar said that "it's the one that was sent to you.  You just need to fax that back over."  *Id.*

While the exact date is unclear, at some point before the foreclosure sale and five months after Jones started the loss mitigation application process (which he began in September), he again called Cenlar to ask about his application.  In the recorded phone call, the Cenlar representative

4

confirmed that the foreclosure was on hold.

> Cenlar Representative: Okay it looks like this package is completed. Foreclosure placed on hold.
>
> Mr. Jones: Well, praise God. After five months, I got it right.
>
> Cenlar Representative: Facially completed package received. Loss mit trailing documents reviewed complete. And that's where it's at right now. And it's in review.
>
> Mr. Jones: Okay. So I just wanted to hear that from you guys.

(DE 47-8 at 3).

Between January 23 and the February 13 deadline, there were approximately 50 entries in Jones' internal file kept by Cenlar. Most of the entries were communications between Jones and Cenlar regarding Jones' attempts to submit the requested additional files. While it is unclear the exact documents that were received by fax, there is an entry from February 7 that says the only missing document was the First Citizens financial form. Over the next 24 hours, Jones faxed eleven documents to Cenlar including a "correspondence letter," two "asset financial statement[s]," and three "miscellaneous" documents. On February 15, upon reviewing Jones' timely submitted documents, Cenlar noted that Jones sent in the "financial form" and that the "package appears to be complete," but then noted that the "form may not be first citizen form." However, it was not until a week later, on February 21, that loss mitigation confirmed with the underwriter that it was the wrong First Citizens financial form. This is reflected in the following entry from February 21.

> Confirmed with underwriter UBAF form is not correct First Citizens form which had been sent to the borrower—package is therefore incomplete—removing workstation and sending out LM307 letter—can reapply with complete updated package to include correct first citizens UBAF form.

(DE 38-3 at 50). Cenlar then informed Jones on February 21—after the foreclosure hearing—that

First Citizens would not consider loss mitigation at this point. *Id.*

After several continuances, the foreclosure hearing—which was originally scheduled for December 10, 2018—was held on February 18, 2019. The court allowed First Citizens to foreclose. Jones did not appeal the order. (DE 38-5). On February 19, 2019, the trustee sent Jones a letter informing him of the foreclosure hearing and the upcoming foreclosure sale of his home on March 18, 2019.

On February 21, 2019, after the foreclosure hearing, Cenlar sent a letter to Jones informing him that his loss mitigation application was "incomplete," that "the deadline to submit the missing documents . . . has passed," and that Cenlar "will no longer continue processing your application." The letter also said that Jones "will need to submit a payment of $8,683.92 . . . to avoid foreclosure" and included the same debt collector notice in all caps as the December 27 letter. (DE 38-3 at 52–53).

On February 27, 2019, Jones submitted additional documents for his loss mitigation application. On March 5, 2019, Cenlar sent Jones a letter acknowledging receipt of the "completed" application. This letter included the same language as the December 27 letter which informed Jones that his application was "complete," that he was "entitled to certain foreclosure protections," and that Cenlar would contact him with a decision. The debt collector language in all caps was also included. (DE 38-3 at 55–56).

During this time, Cenlar was regularly in communication with First Citizens. The record is replete with emails between Cenlar and First Citizens discussing Jones' unique situation:

January 14, 2019: Cenlar [Adrian Paul, Loss Mitigation Underwriter] sent First Citizens [Stacey Miller, Default Analyst] an email with the subject line "JONES . . . FC hold." The email stated:

"Please make sure the foreclosure action is on hold for loss mit[igation] review until 2/13/19."

(DE 29 at 26; DE 47-9 at 1).

January 29, 2019: First Citizens [Miller] sent Cenlar [Paul] an email stating:

We had received request from Cenlar to place on hold until 2/13/19 to due (sic) a complete package, but I'm seeing notes on 1/14/19 that Cenlar is still missing the signed and dated First Citizens financial form, pages of bank statements for December, and more. My hearing is scheduled for Monday, February 4, 2019, please confirm if we truly have a complete package. If the package is not complete we need to move forward with the foreclosure hearing scheduled.

(DE 29 at 30; DE 47-9 at 1). Cenlar [Paul] responded stating:

The process that was established by management and legal/compliance on our end is to keep the foreclosure on hold from the time the facially complete package letter is issued by the opening team until the file is either closed out as incomplete if the underwriter determines that additional information is needed and the file is deemed incomplete (if documents are not received from the borrower within 30 days the file is closed) or until the appeal period has expired if the file is complete and can be underwritten and decisioned.

This file was deemed incomplete by underwriting after opening deemed it facially complete and I cannot deviate from the normal process which is why I advised to keep the [foreclosure] on hold. As of right now it is still incomplete, nothing has come in since 1/14. If First Citizens wants to proceed a different way that's fine but Cenlar cannot be held liable for any issues that may arise from not following the normal process. We cannot issue the incomplete package denial until the 30 days listed on the missing items letter have passed.

(DE 29 at 29–30; DE 47-9 at 2).

February 13, 2019: First Citizens [Miller] sent Cenlar [Carol Siekmann, Foreclosure Team Leader] an email stating:

I wanted to let you know we will continue with the foreclosure hearing scheduled for Monday 2/18/19. Looking at notes, Loss mitigation still does not have a complete package, therefore we will continue to move forward. We were advised to keep on hold until 2/13/19, and he is still missing documents/ proof of workman's comp.

(DE 29 at 33).

February 20, 2019: First Citizens [Miller] sent Cenlar [Donna Johnson, Client Experience] an email stating:

> Please be advised the foreclosure sale is scheduled for March 18, 201[9], we will not place the account on hold for loss mitigation at this point. We are under 37 days prior to our foreclosure sale, in which we are in CFPB guidelines.

(DE 29 at 36–37).

February 21, 2019: Cenlar [Johnson] responded to First Citizens' [Miller] February 20 email stating:

> I have made both Loss Mitigation and Foreclosure business units aware of March 18, 2019 scheduled sale date and provided instruction that the loan should not be placed on hold for loss mitigation.

(DE 29 at 36).

February 28, 2019: First Citizens [Miller] sent Cenlar [Johnson] an email stating:

> Please be advised, I see in Cenlar notes they are still taking documentation for loss mitigation. The foreclosure sale is scheduled for 3/18/19 which is less than 37 days prior to our foreclosure sale to be accepting any loss mitigation. [First Citizens] will not place this file on hold, and cannot guarantee that even if loss mitigation is completed, that it will be reviewed before the foreclosure sale.

(DE 29 at 39).

March 5, 2019: Cenlar [Siekmann] responded to First Citizens' [Miller] February 13 email stating:

> Please advise the current status of this [foreclosure]. Was the hearing held on 02/18/19? Do we have a sale date scheduled?

(DE 29 at 33, 42).

March 6, 2017: First Citizens [Miller] sent Cenlar [Siekmann] an email stating:

> Foreclosure sale is scheduled for 3/18/19, and I've already advised default management for the sale date and that we would not place the file on hold for loss mitigation. They notated the account.

8

(DE 47-9 at 3).

March 7, 2019: First Citizens [Miller] sent Cenlar [Johnson] an email stating:

I'm looking at notes in Cenlar system, where Cenlar received a facially complete package for this loan on 3/6/19. Our foreclosure sale is scheduled for 3/18/19, we will not place on hold due to loss mitigation. This is within the 37 days prior to foreclosure sale. Foreclosure sale to take place on 3/18/19.

(DE 29 at 44).

March 12, 2019: Cenlar [Johnson] sent First Citizens [Miller] an email stating:

Per your email highlighted below, Loss Mit opening has instructed underwriting to close their review. Please advise if there's anything we can do to further assist.

(DE 29 at 51).

March 15, 2019: Cenlar [Johnson] sent First Citizens [Miller] an email stating:

I have just finished corresponding with Loss Mitigation, the underwriter that has this file advised that the LM056 has been sent out to the borrower. Unfortunately, due to the LM056 (facially complete) letter already being issued out to the borrower, it means we are unable to proceed with [foreclosure] at this time. I have asked LM to please ensure they are adhering to any deadlines remaining for this borrower, so that if at all possible [foreclosure] can proceed asap. I apologize for the delay, however, with the letter being issued [foreclosure] can't proceed at this time.

(DE 29 at 46). First Citizens [Miller] responded stating:

This is not acceptable, Cenlar has been advised numerous times that we were going to foreclosure sale on March 18, 2019, and we would not be accepting the loss mitigation package because it was within the 37 days prior to sale. This needs to be escalated, please have a phone call placed to my manager immediately.

(DE 29 at 48). Cenlar [Johnson] confirmed receipt and that upper management had reached out.

(DE 29 at 48). The email chain at Cenlar shows that upper-level managers at Cenlar violated their internal 14-day rule to accommodate First Citizens' request and that they had to perform a manual override which cost around $900 to remove the foreclosure hold on Jones' account. (DE 47-9 at 6–8).

On March 18, 2019, a third-party investment company bought Jones' house at the foreclosure sale. Jones did not attend the auction or file an appeal as authorized by the Clerk's order. (DE 29 at 8). Around April 9-10, 2019, Jones called and sent a letter to Cenlar after he learned that his house had been sold at auction via a note from the investor that was left on his house. (DE 47-12 at 1; DE 1-18). The letter stated in part:

> I am writing this letter to express my total loss of words, anger, stress, and dismay, for the horrific mistake your institution made regarding my account, resulting in my home being sold in foreclosure on March, 18, 2019! On Tuesday April 9, 2019, I walk out my door at 7:45 only to find a note taped to my door stating that an investment firm purchased my home on March 18, 2019 at the court foreclosure auction . . . After months and months of back and forth with CENLAR, mistakes, and inefficiency, I received a letter dated March 5, 2019 advising my Loss Mitigation Application Package appears complete and I would be entitled to certain "foreclosure protection." Much to my shock and surprise, my home got auctioned!

<u>April 12, 2019</u>: After Jones called and sent Cenlar a letter expressing his dismay at having his house sold out from under him when he thought he was going through loss mitigation, Cenlar's Default Management Team [Johnson] sent an internal email to the Escalation Department stating:

> We have a unique situation with this loan, so I'm reaching out to see if you are able to assist. It is my understanding this loan was placed on hold several times while the borrower was working on loss mitigation. We received a facially complete package and sent out a LM056 to borrower. Client pushed back stating they advised on more than one occasion not to place any additional loss mit holds. Client was made aware the LM056 was issued and advised they were moving forward with FC sale. LM said they reached out to the borrower and verbally told them that the LM056 was sent out in error and the borrower is requesting something in writing. I have also been advised the borrower has reached out to Cenlar and the attorney advising they were never told the home was going to Sherriff (sic) sale and are assisting we fix it.

(DE 47-9 at 9).

On April 14, 2019, Jones filed a complaint with the Consumer Financial Protection Bureau ("CFPB"). (DE 1-19). Jones continued to send letters to Cenlar after he could not get answers over the phone and expressed his frustration and dismay at having his home foreclosed on after

10

Cenlar said that he had foreclosure protections.  (DE 1-23; DE 1-24).

## B.    Jones' Mental Health

Jones was diagnosed with severe depression and anxiety in 2003 and declared fully disabled by the Social Security Administration in 2006.  (DE 38-2).  In October 2016, Jones' treating psychiatrist, Dr. Christo, diagnosed him with severe episode of recurrent major depressive disorder without psychotic features.  The diagnosis has not changed since 2016.  (DE 38-1 at 4).

When Jones was asked at deposition how his mental health has changed since the foreclosure, Jones testified:

> After the foreclosure it's probably the first time in my life I had to calculate whether or not life is still worth living.  That's a drastic difference. . . It's a place in life I've never been and the place I don't want anyone else to have to go.  It's the most horrible thing you can ever imagine.  The most horrible thing you've dealt with is when your livelihood, when your castle, when your abode, when your safe haven has been taken from you.  I don't wish it on anybody.  It's been devastating.

(DE 47-2 at 3).  Jones' sister also noticed changes in his emotional state after the foreclosure and testified that the changes were "tremendously" different than those Jones displayed in response to other stressors like a fire in his apartment and being stabbed.  In particular, in response to the foreclosure, Jones' sister noticed the following emotional changes.

> He just walks around like in a daze.  He can't sleep.  You talk to him on the phone. He's crying.  He's upset.  It's just – it's not just his normal demeanor. . . He is very disengaged, withdrawn.  He doesn't take baths sometimes.

(DE 47-1 at 10-12).  Jones' friend, Teshawn Myers, also testified that after Jones lost his home he was "homeless" and she noticed that the foreclosure took a physical took on Jones stating:

> Physically, he gained a little bit more weight.  Rick was always well groomed and more precise, I would say, about his appearance. Sometimes his hair wasn't cut. Again, which was unlike the Rick I was familiar with prior to.

(DE 47-4 at 13).  Dr. Christo, Jones' treating psychiatrist, testified that "external stressors do play a role in whether [Jones] becomes more depressed" and "the foreclosure was a major life stressor."

11

While Dr. Christo could not quantify the effect of the foreclosure on Jones, he believes that his depressive disorder was probably exacerbated by losing his home to foreclosure. (DE 47-5 at 5).

## II.     STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(A). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. *Id.* The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citations omitted). "The burden on the moving party may be discharged by 'showing' . . . an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id.* at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. *Anderson*, 477

U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id.* at 249–50.

## III. DISCUSSION

### A. Emotional Distress Damages

Cenlar moves for summary judgment as to Jones' emotional distress damages, arguing: (1) Jones has not shown any demonstrable worsening of his mental health because his depression pre-existed the events giving rise to the lawsuit; and (2) Jones has not shown that his emotional injuries were severe.

The Court will first address Cenlar's argument that Jones has not shown that his emotional injuries are severe. Cenlar appears to confuse the standard for emotional distress as a type of damages versus as a specific element of a claim. The two are distinct, as explained by the North Carolina Court of Appeals:

> Defendant's argument confuses the distinction between emotional distress as a type of tort damage with emotional distress constituting a specific element in a cause of action. To prove a claim of IIED, a plaintiff must show, among other things, that a defendant engaged in "extreme and outrageous conduct," which caused "severe emotional distress." *Bryant v. Thalhimer Bros., Inc.*, 113 N.C. App. 1, 7, 437 S.E.2d 519, 522 (1993). Similarly, in an NIED claim, one of the required elements is that the plaintiff suffer "severe emotional distress." *Johnson v. Ruark Obstetrics & Gynecology Associates, P.A.*, 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990). In contrast, emotional distress damages, sometimes referred to as "pain and suffering" damages, is a "basis for recovery." *Iadanza v. Harper*, 169 N.C. App. 776, 780, 611 S.E.2d 217, 221 (2005). "Moreover, physical injury is only one aspect of 'pain and suffering,' which also may include emotional suffering[.]" *Id.* Thus, there is a difference when emotional distress is a required element of a claim and when it is a type of damage. Moreover, there is no requirement that a plaintiff must show severe emotional distress in order to recover pain and suffering damages. *See Iadanza*, 169 N.C. App. at 780, 611 S.E.2d at 221–22 (rejecting the argument that

13

> "the psychological component of damages for 'pain and suffering' must meet the same standard as the element of 'severe emotional distress' that is part of claims for infliction of emotional distress"). Thus, plaintiff was not required to show either "severe emotional distress" or "extreme and outrageous conduct" by defendant to be awarded emotional distress or pain and suffering damages.

*Blakeley v. Town of Taylortown*, 756 S.E.2d 878, 884 (N.C. Ct. App. 2014). Thus, Jones need only show evidence of some emotional distress, not severe emotional distress. This he has done.

Cenlar also argues that Jones has not shown the necessary causation as there is no evidence that but for the foreclosure Jones' mental health would have deteriorated, as his depression pre-existed the foreclosure. This argument is unavailing.

When asked at deposition how his mental health was since the foreclosure, Jones testified:

> After the foreclosure it's probably the first time in my life I had to calculate whether or not life is still worth living. That's a drastic difference. . . It's a place in life I've never been and the place I don't want anyone else to have to go. It's the most horrible thing you can ever imagine. The most horrible thing you've dealt with is when your livelihood, when your castle, when your abode, when your safe haven has been taken from you. I don't wish it on anybody. It's been devastating.

(DE 47-2 at 3). Cenlar argues that Jones' conclusory statements alone are insufficient to survive summary judgment. While conclusory statements alone can be insufficient, Jones' sister testified that after losing his home, Jones slept outside on a sofa at his cousin's house. (DE 41-1 at 9). Jones' sister also noticed changes in his emotional state after the foreclosure and testified that the changes were "tremendously" different than those Jones displayed in response to other stressors like a fire in his apartment and being stabbed. In particular, in response to the foreclosure, Jones' sister noticed the following emotional changes.

> He just walks around like in a daze. He can't sleep. You talk to him on the phone. He's crying. He's upset. It's just – it's not just his normal demeanor. . . He is very disengaged, withdrawn. He doesn't take baths sometimes.

(DE 47-1 at 10-12). Jones' friend, Teshawn Myers, also testified that after Jones lost his home he was "homeless" and she noticed that the foreclosure took a physical took on Jones stating:

14

> Physically, he gained a little bit more weight. Rick was always well groomed and more precise, I would say, about his appearance. Sometimes his hair wasn't cut. Again, which was unlike the Rick I was familiar with prior to.

(DE 47-4 at 13). Dr. Christo, Jones' treating psychiatrist, testified that "external stressors do play a role in whether [Jones] becomes more depressed" and "the foreclosure was a major life stressor." While Dr. Christo could not quantify the effect of the foreclosure on Jones, he believes that his depressive disorder was exacerbated by losing his home to foreclosure. (DE 47). Taking the evidence in a light most favorable to Jones, the testimony of Jones, his sister, his friend, and his physician show that his mental health deteriorated after losing his home to foreclosure.

Cenlar further argues that Jones cannot demonstrate a worsening of his mental condition as a result of the foreclosure because Dr. Christo's diagnosis has remained unchanged since 2016 and his treatment of Jones has been "up and down" throughout that time. In particular, Cenlar argues that the impact of the foreclosure on Jones cannot be separated from other negative impacts like being car-jacked at knifepoint, the death of loved ones, being burned as a child, a fire in his home, and chronic illness and pain.

Jones has put forth sufficient evidence for a jury to find that the foreclosure was a cause in fact of his mental injuries—that but for the foreclosure his mental health would not have deteriorated. To the extent Cenlar argues there was more than one cause in fact, "there may be more than one proximate cause of an injury." *Hairston v. Alexander Tank & Equip. Co*., 311 S.E.2d 559, 565 (N.C. 1984). Moreover, the "thin skull" rule provides that if the defendant's misconduct amounts "to a breach of duty to a person of ordinary susceptibility, he is liable for all damages suffered by the plaintiff notwithstanding the fact that these damages were unusually extensive because of [the peculiar susceptibility of the plaintiff]." *Lockwood v. McCaskill*, 138 S.E.2d 541, 546 (N.C. 1964); *Poole v. Copland, Inc*., 498 S.E.2d 602 (N.C. 1998) (applying thin

skull rule to mental injury cases).

Cenlar's final argument on this issue is another equally unavailing cause in fact argument—that Jones' damages arise from his default on the loan, not Cenlar's actions. There is sufficient evidence that Cenlar mishandled Jones' loss mitigation application by sending Jones two letters that his application was complete and that he was afforded foreclosure protections despite Cenlar's knowledge that First Citizens was moving forward with foreclosure. Accordingly, Cenlar is not entitled to summary judgment on emotional distress damages.

B. RESPA claim

Cenlar does not dispute that it is a "servicer" of Jones' loan and is governed by the provisions in RESPA. However, Cenlar argues that Jones has failed to show a RESPA violation because he never had a completed application that triggered the foreclosure protections. Jones contends that he did have a completed application which required Cenlar to issue a final decision, and no such decision was ever issued.

If a loss mitigation application is deemed complete 37 days before a foreclosure sale then the servicer is required to notify the borrower of any loss mitigation options. 12 C.F.R. § 1024.41 (2021). Here, Jones was notified twice that his application was complete and that he had foreclosure protections, subject to any additional document requests. The first time was December 27, 2018, which was more than 37 days before Jones' home was sold at a foreclosure sale. On January 14, 2019, Cenlar requested additional documentation from Jones by February 13, 2019. At this time the application was facially complete, and if Jones submitted the documents before the February 13 deadline, then the 37-day rule would apply retroactively to December 27 when Cenlar originally informed Jones that his application was complete. *Id.* It appears Jones submitted the requested documents, but an administrative error, potentially attributable to Cenlar, led to Jones

16

submitting the incorrect version of the First Citizens financial form. Cenlar did not notice the error until February 21, after First Citizens moved forward with the foreclosure hearing and set the foreclosure sale for March 18.

On March 5, Cenlar sent Jones a second letter informing him that his application was complete and he had foreclosure protections. Cenlar then tried to stop First Citizens from moving forward with the foreclosure sale as evidenced via a series of emails. Ultimately, after upper management at Cenlar and First Citizens communicated, Cenlar manually overrode its customary internal rules on foreclosure holds for a $900 fee. Jones' home was then sold at foreclosure on March 18 without his knowledge. Jones did not learn of the foreclosure until a notice was posted on his door on April 9.

Taking the evidence in a light most favorable to Jones, Jones had a completed application absent administrative error and was never given the opportunity to re-submit the correct paperwork. If Jones had been given the correct form or allowed to re-submit it, it is likely his application would have been deemed complete and the 37-day rule would be applied to the December 27, 2018 date, making the foreclosure sale on March 18 in violation of RESPA. Cenlar's own actions in trying to stop First Citizens from moving forward with the sale and overriding its own internal rules on foreclosure holds provide further evidence that it knew Jones' "unique situation" potentially violated RESPA foreclosure protections. (DE 47-9 at 9). Accordingly, Cenlar is not entitled to summary judgment on the RESPA claim.

C. Negligent Misrepresentation Claim

Cenlar argues that Jones' negligent misrepresentation claim must fail because its letters never specifically promised to cancel or postpone the foreclosure sale. In the letters where Cenlar informed Jones that his application was complete, it said that Jones was "entitled to certain

17

foreclosure protections as we have received your completed application." Jones also believed that he submitted all required paperwork by the deadline requested by Cenlar, however an administrative error, possibly on Cenlar's part, led to Jones submitting the wrong First Citizens financial form. Around this same time, Jones called Cenlar and a representative confirmed that the "foreclosure [was] placed on hold." Regardless, at the time Cenlar sent Jones the March 5 letter informing him that his application was complete and that he was entitled to foreclosure protections, Cenlar knew that First Citizens was moving forward with the foreclosure sale and would not review Jones' mitigation application. Viewing the evidence in a light most favorable to Jones, the evidence shows that Cenlar represented to Jones that he was entitled to foreclosure protection and that his foreclosure was on hold even after Cenlar knew that First Citizens was moving forward with the foreclosure sale and it was reasonable for Jones to rely on Cenlar's representations.

Cenlar also argues that even if it did promise to cancel or postpone the foreclosure sale, a future promise to act is not actionable under North Carolina law. This argument is likewise unavailing as Cenlar represented that Jones was entitled to foreclosure protections and that his foreclosure was currently on hold. This was a representation of present fact, not a promise. *Gen. Elec. Capital Bus. Asset Funding Corp. v. Golden Corral Corp.*, 24 F. App'x 189, 194 (4th Cir. 2001) (affirming summary judgment on negligent misrepresentation claim under North Carolina law where the relevant statement "was not a representation of fact but at most a promise to act in the future."). Accordingly, Cenlar is not entitled to summary judgment on the negligent misrepresentation claim.

D.    NCDCA Claim

Under the NCDCA, Jones must first establish: (1) a "debt" is owed; (2) he is a "consumer"; and (3) the defendant is a "debt collector." *Barnett v. Bank of America, N.A.*, 3:20-cv-272-RJC-DSC, 2021 WL 2187950, at *5 (W.D.N.C. May 28, 2021) (internal citations omitted). "After fulfilling these three requirements, a claim for unfair debt collection practices must then meet the three generalized requirements found in section 75–1.1: (1) an unfair [or deceptive] act (2) in or affecting commerce (3) proximately causing injury." *Id.* (quoting *Reid v. Ayers*, 531 S.E.2d 231, 235 (N.C. Ct. App. 2000)).

Here, it is undisputed that Jones was a consumer who owed a debt.  Regarding the last element, the NCDCA defines a "debt collector" as "any person engaging, directly or indirectly, in debt collection from a consumer."  Cenlar argues that it did not partake in improper debt collection in violation of the NCDCA because it was not a debt collector. Cenlar contends that "collect" is not defined in the NCDCA and that no North Carolina cases have addressed whether communications after a default regarding a loss mitigation application between a servicer and a borrower constitute debt collection.  To support its argument, Cenlar cites to cases interpreting the Fair Debt Collection Practices Act as instructive. *See Reid v. Ayers*, 531 S.E.2d 231, 233 (N.C. Ct. App. 2000) (when interpreting undefined terms in the NCDCA, "we have found cases construing the parallel federal statute to be particularly instructive, though not binding.").

In particular, Cenlar cites to cases that held a loan modification, absent a demand or request for payment, is not a debt collection.  *Farquharson v. Citibank, N.A.*, 664 F. App'x 793, 801 (11th Cir. 2016) ("[T]he letter did not demand or even request that Plaintiffs make any payments."); *Heinz v. Carrington Mortg. Servs., LLC*, 3 F.4th 1107, 1113 (8th Cir. 2021) (statements from Attorney General's Office that loss mitigation assistance application had been sent to underwriting

19

and "included no discussion of the loan, its terms, any amount due, or any request or demand for payment" is not a debt collection attempt); *Spoor v. PHH Mortg. Corp.*, No. 5:10CV42, 2011 WL 883666, at *6 (N.D.W. Va. Mar. 11, 2011) ("[R]epresenting that it would evaluate [borrower] for a loan modification by using correct financial information, but instead used incorrect financial information" is not a debt collection); *Fields v. JP Morgan Chase Bank, N.A.*, 638 F. App'x 310, 314 (5th Cir. 2016) ("Communications in connection with the renegotiation of a loan do not concern the collection of a debt but, instead, relate to its modification.").

Such cases are incongruous with the present case. Here, Cenlar was not a third party simply evaluating Jones' loss mitigation application. Instead, it was the debt collector on Jones' loan and had been collecting payments from Jones for years. After the default, while Cenlar was communicating with Jones regarding his loss mitigation application, every letter that Cenlar sent (seven total) to Jones included the language "this letter is an attempt to collect a debt" and/or "this communication is from a debt collector" in all caps or bold. One letter even specifically asked for a sum certain. The February 21 letter said that "you will need to submit a payment of $8,683.92 . . . to avoid foreclosure." In sum, Cenlar was a self-described debt collector attempting to collect a debt in communications with Jones during the pendency of his application and even asked for a sum certain payment.

While Cenlar does not address the unfair or deceptive act component of a NCDCA claim, taking the evidence in a light most favorable to Jones, Cenlar committed an unfair or deceptive act when it told Jones his application was complete and the foreclosure was on hold when it knew that First Citizens was moving forward with the foreclosure sale and when it failed to allow Jones to re-submit the correct version of the First Citizens financial form. Moreover, the email communications between Cenlar and First Citizens evidence that Cenlar knew that Jones'

20

foreclosure protections may have been violated and instead of issuing a final determination notice on Jones' application or allowing Jones to re-submit the First Citizens financial form as required by RESPA, Cenlar instead manually overrode its customary internal rules on foreclosure holds. This evidence is sufficient for Jones to survive summary judgment

E. Punitive Damages

Cenlar argues that Jones cannot demonstrate facts sufficient to support an award of punitive damages. Jones contends that there is evidence that shows willful and wanton conduct by Cenlar that rises to the level of fraud.

Pursuant to N.C. Gen. Stat. Ann. § 1D-15, punitive damages may only be awarded when the defendant is liable for compensatory damages and either fraud, malice, or willful or wanton conduct is present. "Willful or wanton conduct" means "the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm" and is "more than gross negligence." N.C. Gen. Stat. Ann. § 1D-5.

Cenlar argues that at worst it made a mistake in sending a facially complete notice to Jones that was not required under the RESPA 37-day rule and "there is no evidence of any ill will or intentional disregard for Plaintiff's rights or safety." (DE 38-1 at 19). Cenlar further argues that Jones has not shown that any officers, managers, or directors participated or condoned any such conduct. However, there is evidence in Cenlar's internal emails and external emails with First Citizens that show Cenlar knew Jones' situation was unique and there might be a risk of liability for potentially violating his foreclosure protections. Despite this, after a meeting with upper-level managers between Cenlar and First Citizens, Cenlar elected to manually override its customary internal rules on foreclosure holds for $900 to satisfy First Citizens. The Court finds that this

21

evidence is sufficient to allow a jury to decide whether punitive damages are warranted.

## IV. CONCLUSION

IT IS THEREFORE ORDERED THAT that Cenlar's Motion for Summary Judgment is hereby DENIED.

Signed: June 6, 2022

Graham C. Mullen
United States District Judge